Everybody set? The final case for argument this morning is Humphreys & Partners v. Lessard. Mr. Zummo. I hope I said your name correctly. Close enough, Your Honor. What do you say? Zummo. All right, Mr. Zummo. May it please the Court. My name is Patrick Zummo. I represent Humphreys & Partners Architects, the appellant and the non-movement, in the summary judgment proceeding below. In this case, which is a copyright infringement case involving architectural works copyrights, my client was granted summary judgment against my client on the subject of extrinsic substantial similarity. We believe that the district court committed numerous errors of both summary judgment procedure and basic copyright law. I would first like to point out that the court did not even need to get to the issue of substantial similarity in this case because we presented evidence, what's considered direct evidence of copying in the summary judgment proceeding below. And your direct evidence of copying was the speed at which the two-part crest designs were produced? In part, Your Honor, but there was more. In the M. Kramer Manufacturing v. Andrews case of the Fourth Circuit's decision in 1986 . . . If you could just . . . Yes, I'm happy to . . . Yes, Your Honor. What is your best evidence with respect to direct evidence? First, the defendants actually had a copy of my client's building floor plan in their possession. It's beyond access. They actually had a physical possession of that copy. Second, as the court asked, the speed of the creation of their work. And third, we presented testimony or declaration evidence from an expert architect that the typical iterative process that you would go through to design a building, he found that in my client's files where there were a lot of attempts, let's try this, let's try that. Many of them didn't work. But with respect to having a copy of a plan, that's not direct evidence of copying that. Wouldn't that be direct evidence of access? Access is the probability, yes. That's a part of that inferential process where you don't have direct evidence. So what I'm asking specifically about is direct evidence. And having the copy in your possession is part of the direct evidence, though, Your Honor. Because once they had the copy, their files show that they used it because their process of design step-by-step in the earliest drawings showed that they were working toward what our expert characterized as a preconceived solution to the design. And they did it in a rapid manner. So under this court's holding in M. Kramer and also under the brocade communications case that we presented from a California district court where the identical evidence was held to be direct evidence of copying, we contend that the record showed direct evidence of copying. And as the district court's summary judgment errors repeated themselves, this evidence was never, not just not credited and taken in favor of the non-movement, it wasn't mentioned at all. Can I ask you a question? Because this is something I don't understand. You say that because there was direct evidence of copying, and I'll sort of bracket that for a minute, but assuming that's true, that you don't need substantial similarity. But I thought, I mean, even if there was direct, even if someone conceded, oh, sure, I copied, like I didn't know what to make that day and I saw your skyscraper, so I thought, yes, I'll do a skyscraper too. I copied the idea. It doesn't matter if all you copied was an idea and you didn't copy sort of protected elements. If there's no substantial similarity between what's protected, it's still not a copyright infringement. So why don't you still need the substantial similarity as between the protected elements? Well, just to make it clear, I agree completely with what the court just said. We don't have to go through the access plus substantial similarity circumstantial evidence test. But the copying that, and we believe the way the jury should be instructed, if you find that there was copying, you still have to find that what was copied is itself protectable. Now, in this case, we think that the court erred. One of its copyright errors was in doing what the district court called a disaggregation analysis, where the court said, I have to break down the protected work into all of its component parts to see if they themselves are protectable. But didn't he also look at it in the aggregate? He did, but we believe that that constituted stepping into the next phase of the similarity analysis, which is the intrinsic analysis. But in doing his disaggregation, what Judge Ellis did was he looked at the architectural work and said, well, it's made up of features and elements and spaces. And so I'm going to look at each one of those and see if it's individually protectable. By definition, they aren't. And in that way, architectural works are no different than any other work of creative expression. You couldn't have some element that was a window that is protectable? It's possible, Your Honor. We wouldn't be claiming that here. And there is a statement in the legislative history for the… Why doesn't that make sense to first break it down into the elements? Because, Your Honor, at some level, every protectable work is made up of unprotectable elements. For example… That's why. So that makes the principle that you have to have more than just unprotected elements. The combination and arrangement. That's why you then have the question of the aggregate, isn't it? It seemed to me that it was a fairly sensical and appropriate way to analyze the buildings. The work that's protected as an architectural work is the arrangement and composition of these unprotectable elements. But the approach that the district court took by disaggregating and subtracting those elements, if you did that to any copyrightable work, you would never have a protectable work because . . . But I thought you just told me you might because you could have a window. You might have . . . You could do that. What you would have, Judge, and the legislative history acknowledged that someone might have such an artistic decorative window that it might be protected under another category, the pictorial graphic sculptural work. But a window as a window, a door as a door, is a staple building component that the statute classified as a standard feature, and those are not part of the protectable architectural work. If any work, if you took a book and said, well, let's break it down to its words, those words aren't protectable. If you took music, break it down to its notes and chords, those aren't protectable. What if you took a book and you had pages, and in this one book the pages were fantasticorical, that the page, when you turned to the page, it unfolded and gave you a live action scene? You might say that's a different kind of page than you normally see, although it is a page. I agree, Your Honor. Isn't that just a protection from claiming some right in a commonly used, commonly designed characteristic of a building? You have to do that. By the way, I thought that in doing that, that just would first see if there's some protection for you in an individual element. Our problem . . . Do you think you had a protection in any individual element? No, Your Honor, and we tried to make that clear throughout this case. Well, that moves the case along. You don't think there's any individual element that gives you any protectable right? Anybody can take . . . I'm just saying, but in this case . . . These, yes. You don't claim any protectable interest in any individual component? Correct, Your Honor. Judge? You may be . . . I apologize if I'm asking you this out of order, and you're going to get to it in your argument, but there are a couple of questions that . . . My order is your order. Thank you. Okay, I'm not entirely clear about your argument regarding the expert reports of Gresham. Once the sworn declarations were filed, what's the problem? The problem is that the report itself is still hearsay, and Rules 56 says if the evidence that is used in summary judgment can be shown to be admissible at trial, then you can use it in summary judgment. But you identified a particular deficiency which was cured, I thought. No, we don't believe so, because this is not like a business record where you present an affidavit or declaration that proves it up, where the record can be shown to be admissible as a record at trial. None of the three reports should ever come into trial because they're always hearsay. And so that's our objection. That was one of our objections to those reports. We also objected to the . . . Internally, they were based on incorrect legal principles and contained incorrect definitions. But they were expert testimony on the extrinsic prong, and you objected initially to their bona fides. That was why I was having a little trouble following your argument. We just believe that since the change in the rules in 2010, it's very clear now that you have to put in evidence that can be admissible at trial. So your argument is not that the court improperly relied on expert testimony at the summary judgment phase? Well, we think it was improper . . . that it wasn't admissible. But we also . . . our argument, and I think this is clear under Tolan v. Cotton, we believe that the district court on disputed issues accepted the movements evidence and disregarded and didn't mention ours. I don't understand. That would be the question, at least the question that I had. Maybe I'm stepping on yours. But I thought one argument . . . you may have others, but one argument was that he should not have relied on the expert's report period. That is, Your Honor. Now, you don't argue that anymore? We do. We do. But why . . . maybe I just missed the answer, but that was corrected, at least to the judge's satisfaction, saying, that is what I would say, that is true. Sort of shorthand form for a deposition. I kind of remember there was some schedule issues on some depositions, but why wouldn't that be sufficient, you think? Because the report is still hearsay, so you can't come in and offer the report. If they had put . . . the way to say, here's what I would say at trial, is to do a declaration or an affidavit. Now, no question, if they had prepared a declaration that said virtually the same things that he said in the report, this evidentiary objection wouldn't be here. Let me ask, but at trial then, if he has the report, because the expert report doesn't come in maybe, but then you go object to the report, and the other side, okay, let me ask you, and they flip to page seven and go, let me ask you, if so and so, what would your answer be? I mean, can't they just basically read it into the record? If they do it correctly, they can't, by question and answer. Our objection here is an evidentiary foundation objection. We just believe that there is . . . That is, the substance in that report is correct. Your view is, although it was corrected by that declaration, that you think the court was wrong, and the court should have allowed you the opportunity to make the other side ask a series of 1,000 questions, and then grant judgment as a matter of law. If nothing else changed, it was just that, that they should have to go through asking 1,000 questions. What else would that net you? Our objection was that they didn't offer it in an affidavit declaration. No, but I'm just asking you, the net result of that would be, you'd go to trial. If nothing else changed, the evidence is what the evidence is. This time, the expert would take the stand, and the other side would just ask 1,000 questions of him and her, and they would answer basically every sentence, certainly all the key material that mattered. You say that it is an error on the part of the court not to go through that procedure over which the court would then grant judgment as a matter of law. As I understand the question, yes, if you . . . That's a fair answer. Yes. This court has addressed, over the last few years, architectural works on some very basic levels. In the Charles Ross Bilder case, the court said, the extrinsic-intrinsic test that applies to everything else applies to architectural works. In the Lenar Holmes case, this court said, the rules about access apply to architectural works. What we think happened here that is . . . Let me ask this. Sorry to interrupt you. I'm going to ask the other side to respond to this. If that report, if you just assume for a second that it can come in at this point the way it's written, the expert's report, what then . . . I think you were headed there when I interrupted you. What then did the court do wrong? You say that that report is disputed. It is still disputed, and even if they had offered the substance of those statements in a correct form, there were disputes, and I'm running out of time, but there were disputes in the two experts, our experts and their experts . . . As to what? As to . . . There actually was no dispute that all of these extrinsic features were present in both buildings. There were disputes as to the way that they were expressed. The district judge, instead of identifying those as disputed issues of material fact, he weighed the evidence, and he said, in effect, I accept the defendant's experts, and I'm going to adopt those experts. In many cases, he quoted them verbatim in his opinion. In about half of those extrinsic features that were discussed in the opinion, there's no mention of plaintiff's evidence. For the other half, what the court said was, Humphrey says this, but I find what the defense experts say to be more important. I believe that under Tolan v. Cotton, the court stepped beyond the role of a district court and decided issues of disputed fact, accepted the movement's evidence and not the non-movement's evidence. In accepting the movement's evidence, he actually accepted incorrect propositions of law, which is what the first half of our brief is about. As to the expert, Mr. Gresham, his testimony is, by way of his declaration, is that, signed under penalty of perjury, that there was a deposition to take place, but it didn't happen. Had that deposition gone forward and all those questions been asked at that point, it would all have come in, wouldn't it? Everything he said of deposition would have come in, subject to some other objections. We just chose not to take his deposition at that point. My question is, had he been deposed and everything he said of deposition would be available for a summary judgment? Yes, sir. Thank you very much. Thank you. Okay, now I'm glad to hear from Mr. Coyne. Thank you, Your Honor. Good morning. Judge Shedd, Judge Harris, Judge Duncan. The key issue in this case is the split that is unique to copyright. You don't see it in patent, you don't see it in trade. It's not that it particularly matters to anybody, but it should be Judge Shedd, Judge Duncan, Judge Harris. I'm sorry, Your Honor. Thank you. Very hidebound, if you want to call us by name. I know neither one of them cares, but I just thought I would say that. I apologize, Your Honor. I feel like I was deeply wounded. It was a high point of my year. Well, I'm even more sorry than you, Your Honor. She kicked me and she shook my hand. But just for what it's worth, not to embarrass you, but for what it's worth. Thank you, Your Honor. The key dispute in this case is this idea-expression dichotomy. It is unique to copyright law. I do take issue with some of the statements that Mr. Zumo has made. For example, the evidence of disputes regarding the expression. There is none. We did take the depositions. We took depositions of Mr. Figured and Mr. Humphreys, his principal. And they admitted in their depositions, we've given you those citations. They're unfortunately extensive. There's 20, 30 pages each where we went through the expression of each of these nine features and of the arrangement as a whole. And what they said in their depositions, they admitted they are different. What they're arguing is that the idea, the concept may be similar, may be copied. That's not good enough for copyright law. This issue of the dichotomy between an idea and an expression is rooted in the statute. For architectural works, it has to be embodied in a tangible medium of expression. That's what gets protected, not the idea. And the statute goes on. It says that it does not include these individual elements. What about what the district court did to look at individual elements? I understand the other side's argument to be you shouldn't have done it. I don't think they really would say that that's reversible error. But he just shouldn't have done it. Your Honor, I don't agree with that at all. He absolutely should have done it. And, in fact, this court has noted in other cases that if he had failed to do it and made the comparison on that basis, he would have committed reversible error. That is because some of those elements could be protectable. That is because the statute, the Supreme Court, and other panels of this court have all said what is protected is the expression, not the ideas, not the concepts. So what you have to do is go through. Oftentimes the argument, I guess we hear most often, is that the district court did too little and, therefore, I should win. Rather than the district court did too much and I should otherwise win. Well, in copyright, the statute and the Supreme Court precedent, this could be a difficult issue if it was unclear where between that generalized, abstract idea and that specific expression you had to draw that line. But it's not difficult in this case. In copyright, the statute says it's at the expression. The Supreme Court has said repeatedly, in six or seven different cases, which we've cited in our briefs, particularly the Feist case, what we did not cite is. Which element, individual element, in your mind is the closest to causing a problem? Which one? Which element, yes. Your Honor, I don't think, I think, well, we think all of them are standard. If any of them is. Root feature? That's what I was going to go to. I think the cornice, if any. Did you say that before I said it? Yes, Your Honor, I was. Because we have thousands of examples of some of these other features. You've got testimony from. I think that the root feature is, you don't think that causes you any real problem, but you think that's the closest? No. I think there might be similarities in terms of the concept. Sure, they both have cornices. But in terms of the expression, what gets protected? Look at the images we've provided you in the briefs. They are very, very different. Theirs has this wedding cake structure with three separate cornices. Ours is much more simple and much more plain. In the aggregate, why aren't these buildings similar? In the aggregate? Yes. I'm skipping now. Your Honor, you did ask my opponent that, and I'd like to direct you to page 8054 to 8059. Judge Ellis did, in fact, set aside what he's done on what are now admitted to be standard individual features. I have to look at it in the aggregate. Looking at it in the aggregate, the expression is still different. The whole key here for them was, at the district court, direct access with a dual core structure. Theirs is a square-shaped lobby with all the doors opening onto one lobby. Ours are little H-shaped lobbies that are narrow so you can't see your neighbor's doors. Much greater privacy. The expression of each and every one of these is different. Now, let me come back to it another way to answer that question. We also got admissions from Mr. Humphreys during his deposition that all of our unit plans, all the floor plans for the different units, there's 17 on each floor in ours and 11 on his. He said, oh, well, they swapped those. In fact, they've admitted every one of the residential units is different. So all we're left with is these nine features in the core. They're all expressed differently for the same reasons Judge Ellis found when he went through, looking at their experts coming in and saying, well, the concept, the idea is similar. That's not good enough for copyright. You have to go all the way down to the expression.  One of the cases we cited is a Ninth Circuit case where this idea expression dichotomy test for the extrinsic, intrinsic test really came from. It was called Funky Films, and we cite it in our brief. It's got, you know, so, for example, you've got a funeral parlor. It's the HBO show, Six Feet Under. I never watched it. I don't know if any of you did. But it was accused of infringing. The funk parlor was the prior existing work. You know, the funeral director, it's a family funeral parlor. The father dies. The sons inherit the business. The ne'er-do-well prodigal son comes back. He has a love interest. Mayhem ensues. And what the court held there is that you have these common standard elements, standard individual features. In writing, in architecture. Maybe at first somebody's argued to me an HBO series. Well, Your Honor, I present it because I think it presides a good analysis of similarity in plot, similarity in what the Hollywood artists would call sens de faire, the type of plot vehicles, conceits, if you would, that you use. That's available to everybody. When you look at these buildings, don't they kind of look similar? They look no more similar than any other high-rise residential building. And, Your Honor, if you look at the record, we also gave you pictures of the Harbor Towers project, which my client owns. Look at it. And, frankly, that looks a lot more similar to his building than ours does. That will be the next one. I'm sorry, Your Honor? That will be the next action. Well, Your Honor, I'm afraid Judge Ellis has already put us out of our misery on that one, and we did not appeal that point. But, Counselor, just so I understand, because I do, right, you look at these buildings. They look somewhat similar. But your point is, well, of course they look similar. All residential high-rises these days look something like this because so many of the elements are sort of standard and functional, and so, of course, they're going to look like this. They're going to be tall, and they're going to have a lot of windows. So the things that make them similar are just these kind of standard design elements that I would see in any high-rise building. Yes, Your Honor. And on a more specific level, that's where they're different. That's the idea. And ours are expressed differently. When we took his deposition, Mr. Humphreys thought he was the first one to do two elevator cores with direct access. We've presented to you evidence in this record, and to him, of thousands of examples. This is a very popular design in Florida where our architect worked for a dozen years. That's where he learned of this. So, yes, we are not contesting access. He was given the picture, and we gave him a declaration of what he thought about the picture. Nothing. He said, oh, I already knew that, and threw it in the dustbin because he was aware of things like harbor towers and thousands of other properties that have this dual core, dual elevators with direct access feature. It can be. It can be, though, and it may not be protectable. It's probably not protectable. That a person can have what to that person is an original idea. You just don't realize that others have had that idea before. It is possible, but that's where the copyright law is very specific. We have to have copied his expression. Not copied. We have to have copied, and it's got to be not his idea, his expression. I'm just saying maybe in defense of him thinking that he had thought it up. Oh, we don't win because of the fact that other people. He has this prior art argument. We don't win because other people had done it before. We win because we didn't copy his expression. We may have common ideas. We all have trash chutes. We have mechanical rooms. We have corridors. You have to. The fire code requires it. We have escape staircases. You have to have them. But in each and every one of those features, as well as the arrangement and composition as a whole, ours is done differently, and that's why there's no infringement. That's why it's appropriate to resolve this on summary judgment. This Court recognized that in universal furniture. The Ninth Circuit's recognized that in a number of cases. This extrinsic component of the test. It's not that that is not subject to the normal rules of summary judgment, because everything I've ever seen is, quite frankly, everything in every area. Some people will go, in some cases, well, intent's not subject to it. Yes, intent is. Everything is subject to summary judgment. You have to supply some evidence, but in a case like this, on intellectual property, at least my experience as a district judge and as a circuit judge is, there seems to be . . . people seem to have a tougher time at times with it, because there is gradation issues. They'll say, but it does look a lot like mine. Somebody will say, well, not really. Some people kind of want to think that gradation is not 100% clear, so therefore gradation defeats summary judgment. In fact, two of the cases that we've cited to you in the briefs make that precise point. Justice O'Connor in the Feist decision specifically pointed it out, that Congress could have been a little clearer here when they wrote this statute in terms of drilling it down to expression. And some district courts for years got confused, and that's why they had to decide Feist. The InterVest case, which was an Eleventh Circuit case, makes the same point that it can be very confusing and difficult for a jury to parse through these issues, where they don't get it that they have to stick with expression and not be comparing concepts and ideas, which is why the extrinsic component of the test for those circuits that use it, as this circuit does, is so critical and is appropriate for summary judgment. We're not contesting that the intrinsic test should have been left to the jury, and Judge Ellis did exactly that. He said, look, I see this is something I shouldn't be deciding, and he didn't. He stopped when he looked at each of the individual components, which we have admissions today, were standard individual features, not protectable. And he went further and looked at the arrangement and composition as a whole of the design and concluded, based on the evidence that was presented to him, that they are different. The one thing Mr. Zumo said, that there is dispute over direct evidence of copying, I would like to address that very briefly. There is not. What has to be copied is protected elements. Yeah, there was access. We don't dispute that at all. And, yes, there's commonality on concepts and ideas. But what his experts offered is two things. Mr. Figert and Mr. Humphreys gave us hours of deposition testimony in which they admitted in agonizing detail that these are different down to the level of expression. They then come back at summary judgment and put in declarations saying, oh, they're the same at the level of the concept. That's not good enough to generate a genuine dispute of material fact. Their experts, they have other declarations they've referred to, where they came in and said, well, we weren't aware that these were so commonly known. Well, that's not meeting our evidence. What would meet our evidence and challenge it is said, well, yeah, I went and looked at that building and it doesn't have that feature. Not, well, gee, I didn't know it had that feature. So the evidence that was put forward does not generate a genuine issue. How would you support the district court's grant of summary judgment to Mr. Clark? Your Honor, my colleague, Ms. Payton, will address that issue on behalf of Clark. I'm addressing the substantial similarity issues for all of the defendants. All the defendants except Clark can test access. Clark can test access. Thank you. Your Honor, if the Court has any other questions, I think I've covered what I wanted to say. I'd be happy to cede the rest of the time to the panel unless you have questions. Thank you very much. Thank you. Ms. Payton. Good morning, Your Honors. I'll start first with a question on Clark. The court below decided that Clark did not have access to the Grant Park. It did so because there was no evidence that Clark had ever visited the building, that Clark had been involved at all in the design process, or that there was any shred of evidence that Clark had seen the floor plan. So, therefore, the district court properly decided the access issue. Now, Humphreys didn't actually depose any Clark representatives. It didn't try to take evidence on this point. It merely rested on the idea that Clark could be inferred to have access because it had a contractual relationship with Northwestern and because it was involved in the project. That inference is not evidence of actual copying by Clark, and that's why the district court correctly decided this issue. Now, at the appellate level, they make a different argument. As Your Honors saw from the briefing, there's this concept of direct copying. Direct copying is a concept we use to talk about ripoffs, literal copy, literal reproduction of the work. And when you look at the cases that Humphreys cite, they all support this idea. When you make a copy of the protected work and you pass that copy, even if somebody is downstream and they have no knowledge of that copy, they're a direct infringer. But those are not the facts of this case. There's no evidence that a Grant Park design was ever provided to Clark, nor is there evidence that the two-part crest design is an exact replica or a very close reproduction of the Grant Park design. One only has to look at the judge's appendix to see that. Plus, as Mr. Coyne pointed out, we have many, many admissions during the depositions of Humphreys' principal as well as of their expert that the aspects that they identify as the individual aspects that are copied are not protectable aspects. There's no issue of fact here. And, in fact, at the appellate level in their briefing, they haven't identified individual facts that demonstrate that there are similarities in expression. So now we're left with the question of what to do with a direct copy. They want you to read the actual copying requirement out of Feist. That is not appropriate. We can't ignore access, and we can't ignore substantial similarity in this case, and they have shown neither. In this theory that they argue for the first time in appeal, the direct access to the original work cannot be shown by merely demonstrating that Clark had access to the accused infringing design. Again, that is a concept for a ripoff case. That is a concept where the exact original work or one with very slight variations have been given to the builder. So we're not arguing that Clark had to have knowledge. We're arguing they're applying the wrong test. Now, with respect to the admissibility of Gresham's report, that was a Penrose report, they are making the argument that the substance of the report is not admissible because it's provided in an expert report that was then followed by a declaration affirming the contents. They're making the wrong argument under Rule 56. It's a question about the capability of getting the evidence into the record. At trial, if we happen to go there, Mr. Gresham will show up. Penrose will not be submitting the expert report, nor, I hope, would Humphreys be submitting their declarations. In fact, under their theory, their declarations suffer from the same infirmity. The contents of Mr. Gresham's report provide the substance of his analysis. It is based on a comparison of the two designs. Humphreys has raved no real argument that the substance of the declaration is not capable of being admitted into evidence. And that's really the Rule 56 issue we're dealing with, Your Honors. Anything from you, Allison? Anything? Thank you very much. Thank you, Your Honor. Thank you, Ms. Bailey. And, Mr. Zimmo, we're going to give you the final word. Our argument regarding Clark is that we believe the evidence is that the plans and drawings that were produced by Lessard are infringing. And to make a building, to build a building from an infringing design is an act of infringement. But it's hard to see it as direct. It relies on our assumption of the correctness of the ultimate issue, which is whether or not Tupac Crest infringes. And if Tupac Crest infringes, then a downstream developer or whatever, I guess your contention is, would be guilty. But that requires a threshold inferential leap that's actually the ultimate question to be determined. But our point, Your Honor, and it does depend on the design being infringing, but they are building a copy of a building from that infringing design. That's why we call it direct. One of the harms of the district court's opinion is it creates a road map for people who want to infringe to create an infringing copy and then give it to somebody else who doesn't have access to actually produce it. That's the harm of that theory, and that's why it's incorrect. But the case law looks at situations where an identical copy is passed down the line to the developer who may or may not have been aware that it was an identical copy of a copyrighted work. In fact, it doesn't matter whether they're aware. But if they're making that copy. Yeah, if it's a virtually identical copy, that's one thing, but that's not your argument. If it's an infringing copy, Your Honor, we don't think it has to be identical, and we disagree with Clark on that point. May I display the joint appendix to the court? The floor plan comparison of the two floor plans. This is on page 5220 of the joint appendix. That is the comparison of those two floor plans. We don't believe there's any way that you can say as a matter of law that they cannot be substantially similar. Compare that to the items that Judge Ellis pointed out where he believed evidence that the Humphreys design was not original, which are found in the Gresham report at Joint Appendix 3573 and 3574. I would just suggest to the court that if these floor plans were close enough for Judge Ellis to say that the Humphreys design can't be original, then this one is far, far closer. We believe that that alone is an indication that there is a question of disputed material fact. The difference here in the evidence, we relied in preparing our case on the cases we were able to find from circuits that apply the extrinsic-intrinsic test. We cited those in our brief. They look at the extrinsic test as a, are these elements both present in the two designs? If they're in the same ballpark, then we go to the intrinsic test to say, do we decide whether one's so close that one was copied from the other? The reason we say that there is a disputed issue in the expert testimony that the district court should not have resolved on his own is when you look at the declaration of Mr. Feigert, he doesn't just identify extrinsic elements. He also refers to how they are related to each other. This design didn't just involve a bunch of discrete elements. In this court's decision in Towler v. Sales, the court said correctly, you can't prove similarity with a list of unrelated similarities. We believe that the converse also ought to be true. Which feature is most similar? It's the combination. All of the elevator lobbies are connected by a corridor that none of the units break off of. All the units open into those elevator lobbies. And that's what our clients, whose declarations are in the record, Mr. Hunt and Mr. Lux, said they'd never seen this before and they spent their whole lives in this kind of construction and development. And that combination in that way is what we believe . . . She does what again? What is unique about it? The elevator lobbies, all of the units open onto those lobbies. No unit opens onto the hallway. And so when you go to your home, you don't feel like you're walking down the hallway of a hotel. And that's what . . . our client was able to put that together in a way that worked as a building. And that arrangement of spaces is the architectural work that's protectable. But we just . . . we believe . . . Having an elevator lobby, that's the thing? It's how the elevator lobbies are arranged with all of the other elements. I just feel like a nomenclature problem for me. I thought elevator lobby meant you don't feel like you're walking down a hotel corridor. Your door opens into an elevator lobby. Well, and that's true. The elevator . . . if you go to the typical long hallway hotel, you still step into a lobby. But then the lobby connects to a hallway that goes . . . I thought as you . . . because I know you list those nine elements. This is really just a definition question for me. Sorry, you list those nine elements and one of them is elevator lobby. But I thought that sort of that phrase, as you use it in that list, incorporates exactly what you're saying. That the doors . . . you don't feel like you're on a long corridor. The doors open up onto a lobby. I didn't mean that. Because you can have lobbies where no units open onto the lobby. Okay, so as you listed in your list of nine things, it has no meaning at all. Because if you're in an elevator, you have to be able to step out into something. The lobby is the space you step out into. Whether the units connect to it, you can do that or you can not do it. That's a design decision. Okay, and is elevator lobby . . . am I right about this? It's listed in your nine . . . your list of nine elements. One of them is that when you step out of an elevator, you don't fall into open air. There's something there. It's in two of the elements. Because the lobbies are connected by a corridor that the units don't open onto. And then it's in another element where the units open directly into an elevator lobby. If you don't have a private elevator, you always get off an elevator in a lobby. Correct, yes. You're just saying your unique design that you represent is that you don't have to go down a hall to get to a room. You step out . . . the space you step out into, you then access your room from. And we don't . . . the design doesn't . . . that's right, Your Honor. The design doesn't have to be unique to be protectable. I use that just . . . Okay. That's what you say is the most distinguishing. I asked you that question, I thought. Yes. Thank you very much. Thank you, Your Honor. Thank you. We will have the clerk adjourn the court. Step down. Honorable court stands adjourned until 2.30. God save the United States and this honorable court.
judges: Dennis W. Shedd, Allyson K. Duncan, Pamela A. Harris